PEOPLE, PLAINTIFF AND APPELLEE, *v.* PORTO RICO RAILWAY, LIGHT & POWER COMPANY, DEFENDANT AND APPELLANT.

APPEAL from the District Court of San Juan, Section 2, in Injunction Proceedings.

No. 1370.—Decided June 19, 1917.

INJUNCTION—FRANCHISE—IMPAIRMENT OF CONTRACT—RULE OF CONSTRUCTION.— A grant of rights in public property accepted by the beneficiary amounts to a contract entitled to protection against impairment by action of the State. Although the grant must be made in plain terms in order to convey private

rights in public property and to prevent future control of such privileges in the public interest, it should receive a reasonable construction and not be so construed as to defeat the intention of the grantor, and the ambiguity must be such as is not removed by the settled rules of construction.

ID.—JUDGMENT.—A judgment is the conclusion of the law on the matters contained in the record, or the application of the law to the pleadings and to the facts as found by the court or admitted by the parties or deemed to exist upon their default. That only is a judgment which is pronounced between the parties to the action upon the matters submitted to the court for decision. It must be responsive not only to the proofs but to the issues tendered by the pleadings and will be void if it be a departure from the pleadings and based upon a case not averred therein.

ID.—APPEAL—THEORY OF CASE.—The theory upon which the case was tried in the court below must be strictly adhered to on appeal, and a party in the appellate court cannot assume an attitude inconsistent with that taken by him at the trial.

The facts are stated in the opinion.

*Mr. J. Henri Brown* for the appellant.

*Messrs. Howard L. Kern,* Attorney General, and *Salvador Mestre, Fiscal* of the Supreme Court, for the appellee.

• MR. JUSTICE HUTCHISON delivered the opinion of the court.

Early in 1913, at a point in Puerta de Tierra, between the old municipal jail, now a factory of the American Tobacco Company, and the San Antonio Channel, where the tracks and right of way of appellant are located upon lands of the Insular Government and, together with the tracks and right of way of the American Railroad Company, lie between the *carretera* and other lands of the Insular Government on the north and the mangrove swamp used as a dumping ground for garbage and the waters of the Bay of San Juan on the south, the Sanitary Department constructed over the said right of way and tracks of appellant a crossing and approaches thereto for the use of its garbage wagons, thus enabling them to pass directly from the road to the spot selected for unloading, instead of crossing, as up to that time had been the custom, a few hundred meters to the westward between the American Tobacco Company building and the wireless station. After an accident had occurred resulting in the death of the driver of one of the garbage wagons, the respondent company removed some of the boards lying

between the rails of its track, thus rendering useless the crossing so constructed without previous notice to it; and thereupon either the Sanitary Department or the Commissioner of the Interior proceeded to replace the boards so removed and to obtain simultaneously the issuance of a preliminary writ of injunction to preserve the status thus created.

The petition, if we supply the words principally relied upon by the Government and omitted in transcribing section 11 of the franchise of appellant, to wit, "or within the space reserved therefor," and amend a slight inaccuracy in the translation into Spanish from the English text of said section, alleges:

"That on March 29, 1913, and before that date, there was a crossing over the street railway line of the respondent at a point in the ward of Puerta de Tierra, San Juan, in front of the tract of land used by The People of Porto Rico for the holding of the Insular Fair, about 200 meters from the principal entry to the building of the old jail, now used by the Porto Rico American Tobacco Company as a factory and to the east of said building.

"That on March 29, 1913, said crossing was used and had previously been used for a long time prior thereto as a means of ingress and egress to and from the tract of land possessed by The People of Porto Rico and used by the Department of Sanitation of the Insular Government as a dumping ground for garbage. That said crossing was used only by the carts of the Department of Sanitation which were necessary to the use of said land for the purpose to which it had been dedicated.

"That the rails of the respondent company at the point where the crossing is located are laid within the space reserved for the public road.

"That by conclusive provisions of its franchise, dated May 6, 1909, under which the defendant is operating its trolley line, said respondent is bound to maintain its road-bed between the tracks and for a space of one and one-half feet on either side thereof, in accordance with the following provisions (we refer to the copy of said franchise hereto annexed and made part hereof):

" 'Section 10.—Whenever grantee's additional railway lines shall cross or rest upon public roads or streets the same shall be constructed

and maintained as provided in section 11 hereof; and wherever said additional railway lines shall be constructed, under the conditions of this franchise, over public Insular lands other than roads or streets, grantee is hereby given the right to use and occupy for said purposes a right of way not exceeding eight meters in width, with such additional width as may be necessary for the slopes of cuts and embankments; and wherever it shall be necessary for the grantee to occupy private lands for said purpose it is hereby authorized to use, occupy and condemn a right of way over same not exceeding eight meters in width, with such additional width as may be necessary for the slopes of cuts and embankments, provided that between stop seven of said present railway track and said street leading from said military road by the Union Club, grantee may widen its right of way not to exceed an additional eight meters; *Provided, however,* That if any portion of the said additional railway lines crosses any lands heretofore reserved by the President for military, naval or other federal purposes, permission to cross and use the same must be obtained by grantee from the proper authority to so cross, use or occupy the same.

" 'Section 11.—The right of way of said railway already constructed shall remain as now being used and occupied by the grantee and as hereinbefore further authorized; *Provided,* That nothing in this franchise shall be construed to give the grantee any additional right of way on any public highway except as herein set out, or to authorize it to condemn the same or any part thereof.

" 'Wherever said railway crosses or rests upon the public road or other public thoroughfare, the road-bed between the tracks and for a space of one and one-half feet on either side thereof shall be maintained by the grantee in a state of repair satisfactory to the Commissioner of the Interior, and such road-bed shall be constructed and maintained so as not to interfere with the proper drainage and maintenance of said road or thoroughfare.

" 'Whenever directed by the Commissioner of the Interior so to do, the track of the grantee where it crosses, or rests upon a public road, or public thoroughfare, or within the space reserved therefor, shall be altered or repaired by the grantee in accordance with the plans of said Commissioner. On failure of the grantee to make such alterations or repairs, they may be made by said Commissioner, and the costs thereof may be recovered against the said grantee.'

"That notwithstanding the obligation laid upon the respondent by the terms of its franchise above quoted, said respondent has vio-

lated the same completely and totally and refuses to maintain said crossing in said condition and in the state of repair required of said company by the Commissioner of the Interior, although the respondent's rails rest upon the space reserved for the public road at the point where said crossing is situated.

"That said company, failing in the duty and obligation imposed upon it, on March 29, 1913, through its agents, servants or employees, took up and entirely removed the boards constituting said crossing and subsequently has refused to replace them as was its duty and obligation, as hereinbefore specified.

"That on May 15, 1913, the Commissioner of the Interior of Porto Rico ordered the respondent to restore said crossing as required by its franchise, and in answer to said order the Commissioner of the Interior received a letter from the respondent company, dated May 21, 1913, refusing to comply with said order.

"That on June 3, 1913, your petitioner, through its agents, servants or employees, ordered the replacing of the boards constituting said crossing in the same condition as before, acting according to the provision of the respondent company contained in the above-mentioned franchise which gives to the Commissioner of the Interior the right to maintain the road of the respondent company and the space adjacent thereto in such a condition as the Commissioner of the Interior may deem proper, in the event that the respondent company should refuse to comply with the orders of the Commissioner of the Interior to that effect.

"That the said respondent company has threatened to take away and remove said boards constituting said crossing, and it continues to threaten so to do, violently and by force, obstructing the maintenance of the said crossing in its former state, use and condition.

"That your petitioner, through its Department of Sanitation, will suffer great and irreparable damage and injury if said crossing be not permitted to remain where and as it previously was. That any other means of access or of ingress and egress to and from said dumping-ground is impracticable and difficult and would cause great inconvenience and expense to the said Department of Sanitation.

"That your petitioner merely prays that the status be maintained until the rights in said controversy be finally determined."

The trial judge, on rendering judgment for the petitioner, filed the following opinion:

"By this action the petitioner seeks to obtain from this court a

final order, addressed to the respondent company, enjoining it from obstructing the accustomed use of the crossing established over the railroad that said respondent has constructed between the city of San Juan and the town of Río Piedras, at a place in front of the tract of land used by The People of Porto Rico for the holding of the Insular Fair and 200 meters to the eastward of the entry to the building of the Porto Rico American Tobacco Company; and, likewise, to enjoin respondent permanently from removing or causing to be removed the boards constructed over the said way, or otherwise impeding or obstructing the crossing of the garbage wagons of the Department of Sanitation which carry the refuse to be dumped upon a tract of land that said Department of Sanitation has dedicated to such use.

"The respondent appeared before this court, moving that the petition for injunction be dismissed for the reasons stated in the written answer of record herein.

"There is only one issue of fact to decide; to wit, whether or not the road that the respondent has established between the city of San Juan and the San Antonio bridge is situated at the point used by the Department of Sanitation for the passage of the garbage wagons within the *carretera* zone, and, if this appears from the evidence adduced by the petitioner, whether the right is a clear one.

"After an elaborate study of the evidence offered by both parties, we will condense in a few words our view of this interesting question.

"Whatever width the *carretera* might have had originally, the evidence, in our opinion, has established that the double track which the respondent company has constructed at the place where the crossing of the petitioner is situated is located within a space reserved for the *carretera*, and the reason seems to us very simple: all lands lying to the south of the *carretera*, those belonging to The People of Porto Rico as well as those of private ownership, are bounded on the north by the central highway; and from the official plat it also appears that the southern limit of said central road at the place of the crossing is determined by a straight line parallel to the principal façade of the very old building originally called the civil hospital, later jail and now the property of the American Tobacco Company, which straight line passes at a distance of one meter from the most salient part of the principal front of the said building to the south of the double track of the respondent and at a short distance therefrom, said track being situated, therefore, on the unmacadamized and untraveled part of the *carretera*, but within the portion or zone

reserved therefor.   All the evidence offered by the plaintiff more than justifies this assertion.

"On the other hand, the tramway originally established between San Juan and Río Piedras, and owned by Pablo Ubarri, was operated on a single track laid at that time upon the macadamized portion of the central highway; but thereafter the exigencies of traffic required that said track should be removed from the *carretera,* which was' done after a study made by engineer Tulio Larrínaga, who was an important witness at the trial and who testified that when he drew the 'descriptive memorial' on that account prepared by him, and stated therein that the tramway track on the property of Ubarri should be removed from the *carretera,* he was referring merely to the traveled portion of the *carretera,* but was not discussing other lands nor the expropriation of any private property.

"Moreover, section 11 of the franchise of May 11, 1909, under which the respondent company has built its road and which was put in evidence by petitioner, provides, among other things, the following:

" 'Whenever directed by the Commissioner of the Interior so to do, the track of the grantee, where it crosses or rests upon a public road, or public thoroughfare, or within the space reserved therefor, shall be altered or repaired by the grantee in accordance with the plans of said commissioner.   On failure of the grantee to make such alterations or repairs they may be made by said commissioner, and the costs thereof may be recovered against the said grantee.'

"It is clear that. according to this section of the franchise, The People of Porto Rico has the right to establish a crossing over the respondent's tracks at any place where the road rests 'upon a public road or public thoroughfare or within the space reserved therefor,' and the further right to require from the respondent company the making of such alterations and repairs, and in such places as may be in accordance with the plans of the Commissioner of the Interior, or if the company fail to make such alterations and repairs, they may be made by the Commissioner of the Interior for the account of said company.   And it is clear that under this section of the franchise it is not necessary for the petitioner to prove that the crossing or place in question which is sought to be maintained is situated on a public road or public thoroughfare, but it is sufficient to show that it is 'within the space reserved therefor.'

"Subsequently the respondent, in order to lay a double track, widened the embankment over which the original single track had been built, but no evidence has been adduced to show that the lands

over which the single track was first constructed were the exclusive property of the respondent and that the other lands over which the double track was built were so owned, nor in the event that such parcels of land were granted by competent authority who was deprived of the possession thereof in order to transfer them to the respondent.

"This is a point the determination of which is very important, as we have already said, because if all the land situated on the south of the central highway is bounded on the north by the said highway, undoubtedly the portion thereof occupied by the respondent company for the establishment of its road either belongs to the *carretera* or belongs to the owners of the property bounded thereby, and this has not been clearly expressed either in the original concession of Ubarri, or in the franchise granted by the Executive Council to the respondent; nor does it appear, on the other hand, to have been sold by the adjoining owners, nor is there any indication that there were any condemnation proceedings.

"The evidence also shows that the place where the wagons of the Department of Sanitation now cross the tracks of respondent is the only possible way to reach the dumping-ground, since the old road that was used when the garbage was deposited in a nearer place, that is, crossing to the west of the American Tobacco Company building, is quite distant from the spot where this work is now done, the same being, moreover, a sandy road that in wet weather is converted into mud axle-deep, causing difficulties in transit and great expense to the Department of Sanitation in the repair of its wagons.

"The respondent alleges in its answer to the petition, and on this point some of its witnesses have testified, that the crossing over its tracks, as constructed by the Department of Sanitation, obstructs the service of the company and constitutes a peril to the operation of its electric cars; but a mere ocular inspection as made by the court at the place of the crossing in question easily convinced us to the contrary of this assertion. Said crossing is 20 meters 94 centimeters in length and 4 meters 32 centimeters in width, and a person on foot situated at any point in front, after crossing to the south of the double track of the respondent, can see an electric car from the time it passes the northern corner of the American Tobacco Company building throughout its course to the San Antonio bridge, and vice versa; and, likewise, any motorman can see any wagon used by the Department of Sanitation from the time it passes the place above referred to or leaves the San Antonio bridge, said motorman as

well as the drivers of the Sanitation Service wagons having time enough to adopt any measure to avoid the collision of the vehicles.

"For the reasons stated we think that the relief prayed for herein should be granted."

The original franchise for the road now owned and operated by appellant was granted in 1878 and the section of track involved herein was first laid upon the bed of the *carretera.* Shortly after, the removal of such track from the road and the reconstruction thereof along the line at present occupied as a right of way were duly authorized.

That the section of road in question, at the time it was thus rebuilt upon an embankment over marsh lands then under water at high tide, rested neither upon the public highway nor upon lands reserved therefor, is hardly open to argument. The vague and unsatisfactory statements of various witnesses in response to most unaccountably suggestive questions framed by attorneys for the Government and permitted in the face of constant objection by opposing counsel afford no tangible basis for the theory sought to be established thereby that the tracks and right of way of appellant were within what from time immemorial had been reputed to be "the road" or to "belong to the road" or to be "a part" thereof or of the "zone reserved therefor." What little weight might be attached to this testimony is more than counterbalanced by the admitted fact that there is no official record or documentary evidence of any such zone or reservation, and by the positive provisions of the Spanish Road Law. And a glance at the record suffices to destroy the value placed by the trial judge upon the isolated extract made by him from the statement of the aged engineer who early in his long professional career had drafted the descriptive memorial of 1881. That document, viewed in the light of the testimony of its distinguished author taken as a whole, speaks for itself, and we do not deem it necessary to discuss in detail this phase of the case.

An entry in the registry of property recites that the

grounds upon which the old jail stands are bounded on the north by the *carretera*; that this land was turned over to the State by the military authorities in 1867, and that the same was sold at public auction to the municipality in 1876. A marginal note mentions the segregation of a parcel sold to Alfred Solomon, and a second entry, dated May 6, 1891, in the name of the municipality, describes the building as fronting on the road.

A certificate by the superintendent of bridges and public lands on file in the Department of the Interior, dated November 27, 1902, states that at the instance of the *alcalde* of San Juan the superintendent of public works ordered a survey of these lands according to an official plot made in 1880; that the same are situated "in the third zone of the *barrio* of Puerta de Tierra of the city, adjacent to the southern margin of *Carretera* No. 1 and within the parcel lying between the first and second lines of defense," and that "this parcel of land is affected, as indicated by the plan, by letters *a, b, c, d, e, f,* consisting on the west of a rectangle *a–b–c–f,* 140 meters in length measured in a direction parallel to the center of the road and 100 meters in width in the normal direction of such center, united to said rectangle the side *c–f,* prolongation of the side *a–f,* which stops one meter from the northernmost salient of said building. The minor base *d–e* of the trapezium, also normal to the center of the road, measures 85 meters. The side *a–b* coincides with the external facing of the berm of the foundation of the western wall of the buildings, said line *a–b* having been originally run at 150 meters from the crest *g* of the counterscarp of the salient most to the east of the second line of defense and both measuring 150 meters following the line *g–h* parallel to the center of the road above mentioned."

The Commissioner of the Interior, in 1907, at page 324 of the annual report of the Governor for that year, says:

"One of the most important surveys undertaken by the bureau of public lands during the past year was that in reference to the

adjustment of the boundaries of the naval reservation by which the boundaries of the insular property and those of the naval property were definitely determined by a joint commission appointed by the Secretary of War and the Governor of Porto Rico.

"The Hon. Frank Feuille, attorney general for Porto Rico, was selected by the Governor to act with Capt. Samuel C. Lemly U. S. Navy, retired, the representative of the Navy Department, to settle certain disagreements which had arisen between the Navy Department and the Insular Government in reference to the boundaries of a certain tract of land reserved by the President of the United States, acting under the authority of an Act of Congress of July 3, 1902. This adjustment was very necessary and is of the utmost importance to the Island, as it settles definitely matters which have been for a long time in dispute.

"By the settlement the Government acquired the land on both sides of the central *carretera,* or military road, at the entrance to the urban zone of the Municipality of San Juan. This land is very useful for the extension of our system of public buildings, and part of it is to be appropriated for the erection of the new capitol building.

"The Government also acquired the water-front along the San Antonio Channel, which will give to the port of San Juan greater facilities for the accommodation of its commerce.

"By this allotment the Island will be able to reclaim about 100 acres of swampy land along the channel and convert it into useful lands for docks, warehouses, etc.

"The Insular Government transfers to the Navy Department about 12 acres of land in Puerta de Tierra and the *presidio,* or penitentiary building, which is situated on the water-front immediately below the palace. The land known as the '*puntilla* tract,' on which is the present navy-yard, was already conceded to the Navy by a formal proclamation of the President, and the *presidio* completes that tract of land.

"The attorney general gives a very clear account of the adjustment of these properties in his report to the governor this year.

"By reference to the appended map the property acquired by the Government can be readily seen."

Neither in this reference, nor in the report of the attorney general (same volume, page 55), nor in the record before us, save as hereinafter set forth, is found any indication whatever that the boundaries of the Insular highway were

in dispute or in anywise involved in the Lemly-Feuille agreement, or at all connected with the purpose for which these commissioners were appointed.

A subsequent proclamation by the President "conveying to The People of Porto Rico certain lands and buildings reserved for purposes of the United States" described, among other parcels, the following:

"South of the *carretera* in Puerta de Tierra.—Tract of land situated in the third zone of the suburb of Puerta de Tierra, in the municipality of San Juan, bounded on the north by road No. 1 and west by the lands belonging to the old jail, now the factory of the American Tobacco Company, the boundaries being as follows: Beginning at a point located in the northwestern angle of this tract of land, marked in the plan with the No. 1, which point is located at a distance 302 meters from the northwestern angle of the building that was formerly a jail, and in the line running in the same direction of the front side of said building and passing at a distance of one meter from the most projecting part of the northern side of the building; thence from this point in the direction of this line, the southern margin of the mentioned road S. 670.44′ 34.8′ E. In the sexagesimal division, or 1240.73 in the centesimal division 405.65 feet, or 123 meters and 63 centimeters, to point No. 2. * * *."

Although the trial judge does not identify the "official map" referred to in his opinion as fixing the southern boundary of the road or of the zone reserved therefor, he evidently had in mind Exhibit 1 of petitioner, described on its face as "a part of the lands belonging to The People of Porto Rico in Puerta de Tierra, San Juan," and dated May 31, 1913, one of the few if not the only item of documentary evidence admitted without objection doubtless because it was expressly offered "only to determine the place where the grade crossing is situated and the surrounding land," and which is now claimed to constitute "reputation evidence" as to the true boundaries of the public road.

The testimony of the chief of the division of public lands in regard to this plot is in part substantially as follows:

"I do not know exactly in what year that road was constructed,

but it was more than 30 or 40 years ago; in order to mark the limits of what I call the road zone, the data to determine such limits, when the lands for the Navy reservation were to be determined, that strip of land 20 meters wide was marked on the ground as the limit of the road; that was done by Armando Morales, then chief of the division, but I personally worked as an employee. The points to determine the limits of the road were established in order to mark out the limits of the lands to be used for the naval station; that was when Capt. Lemly came from the United States to separate the limits of the Navy reservation, and it was then agreed to mark out said parcels A, B and C on this and the other side of the jail. The two authorities in charge of marking out these limits of the reservations for the United States Government were an agent of the Navy Department of the United States and an agent of the Government of Porto Rico; the object of the act effected by the parties, through these officers, was to fix the limits, to mark out the boundary lines of the tracts of land then to be reserved by the Navy Department; that was the object of the plans then drafted, in the year 1905. In order to determine the line of what is called the road zone, I did not take as data the monuments set up by the commission that drafted the plans, the tracts had not yet been reserved; there was to be marked out what was to be reserved. I took as the southern side of the road the northern line of the land sold by the municipal council for the old jail, so that the prolongation of said line on both sides constituted the southern side of the road; afterwards, on the northern side, starting from the stone of the southeastern angle of the military reservations, was done in 1903 parallel to the southern side of the other line. When I tried to fix the limits of the tracts of land to be reserved by the United States Navy Department, in order to mark out the boundaries of the road toward the south, I took as a basis the northern limit of the land sold by the Government to the Municipality of San Juan; in other words, the property which is now the cigar factory and previously a jail. The width of the portion of land lying in front of the cigar factory which was sold to the municipality was one meter, starting from the most salient point of the building on its northern side, so that in order to establish the southern line of the road at this place the line representing the northern limit of the property sold by the Government to the municipality of San Juan was prolonged; this was the only data I had to mark out the southern limit of the road. In order to fix the northern limit of the road, the data I

had, starting from a stone monument situated in the southeastern
angle of the lands occupied by the wireless telegraph station, on a
line parallel to the southern side, that monument established in that
place is one of the angles of the lands reserved for the War Depart-
ment, fixed by the Military Government about 1903, and that mon-
ument was put at that place in order to mark out the limit of the
tract reserved for the military branch; it was not a point arbitrarily
fixed by the parties as a limit of the road. Previously there was no
monument at that place. The data that the Government had at
that time to fix that monument at that place, as an engineer that
took charge of the work came and took reports from the Department
of the Interior about the limit of the road, I suppose that they gave
him that data. In the Department of the Interior there is no record
regarding the limit of the road at that place. At the place where
the monument is situated, marked No. 7 in the plan, there is no
record whatsoever, but simply the width of the road; this point,
this monument, was fixed by the Military Government in accord
with the Insular Government in 1903 as a limit of the tract reserved
for the War Department.

&ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;

"In summary, in order to fix the limits of the road that appears
marked No. 1 in the plan, that is, in the first plan presented by
petitioner, I have taken as a basis for the southern limit of the road
the limits I have fixed, as said, at the time when the limits of the
tract to be reserved by the Navy Department were marked out, but
this, of course, was by order of my chief; and this line, being pro-
longed, then I obtained the line appearing as the southern limit of
the road; and in order to fix the northern limit of the road, I took
as a starting point the monument marked No. 7 on this plan, a
monument fixed by mutual accord between the War Department of
the United States and the Insular Government, when the limits of
the navy reservation were marked out; and starting from this
point I ran a line parallel to the opposite limit marked on the southern
side; these are the sole data I had to fix the road zone; there is no
other record in the Department that I know of. The distance be-
tween these two parallel limits, which I call in the plan the northern
and southern limits of the road zone, is 20 meters; on this map the
gutters are not marked; the line representing the northern limit
of the road is north of the gutter existing at this point; the width
of the macadamized road, traveled at this point, is, I think, six or
seven meters. There is no other space at that place that can be util-

ized that is in a condition to be used as a road. At that point the same trolley line was formerly on the northern side of the road, now there is a gutter on the southern side of the road and that gutter is to the north of the rails of defendant's trolley; the distance, more or less, between the track of the defendant at the place, let us say of the crossing and the gutter, between the nearest track and the gutter, is scarcely one meter, I am not sure because I have not such data. The distance between the northern limit of the road zone and the northernmost rail of the track of the defendant is about 13 meters, 8 centimeters. The remainder of the 20 meters, that is, 6 meters, 92 centimeters, is occupied by the trolley track, and then a piece of 20 meters and 20 centimeters between the tracks and the southern limit; and all this portion occupied by the tracks, that is, six meters and a fraction, is within what is called the zone reserved for the road. At the place where the trolley tracks pass said crossing and up to the San Antonio bridge the tracks lie upon an embankment. This line which I have marked as the southern limit of the road is at the base of the embankment along its whole length, extending, from the curve zone. This plan was not made for the purpose of establishing the width of the road in zone No. 2, but was drafted for the purpose of tracing the lands on each side of the road, dividing them into lots and reserving the road zone.

"This tract of land which appears on the map marked A as 'Navy Reservation now People of Porto Rico' is a tract of land reserved by the Navy Department for navy purposes and afterwards was conveyed again to The People of Porto Rico by a proclamation of the President of the United States. In relation to the grade crossing, it is situated 11 meters 88 centimeters from the northwestern angle of said tract; the grade crossing occupies part of the tract of land and part of the road zone.

"The respondent moves, your honor, to strike out that part of the answer which says that the crossing occupies part of the road zone. This is a question to be settled by the court. It may be the opinion of the witness.

"The witness answers that, according to the map, it occupies part of the road zone and, according to the map, is bounded on the north by the road.

"Cross-examined by respondent, witness Castro replied: 'I said the other day that the line which in this plan marks the southern limit of the road at that place where the grade crossing is situated is, more or less, over the land adjacent to that upon which the tracks

of the defendant company are laid. As to whether or not I know that when the respondent company constructed its double tracks over this place it had to obtain from the Federal Government, from the Navy Department, a strip of land just in that place in order to widen the embankment, I have not been informed; I know nothing about that.' Respondent.—'Do you not know, Mr. Castro, that at this place, towards the southern side, at the time the double tracks were constructed, the embankment was widened southwards, so that from 1909 the embankment on the southern side occupied more space than it did before?' The witness answered: 'I know that the embankment was widened, but I don't know on which side. This map was made two months ago; I made it myself after I took all the data upon the ground.'

"Counsel for respondent: 'Then if it is true that this line marked by you on your plan as the southern limit of the road at said crossing is situated, more or less, at the foot of the embankment, and if it is true that said embankment has been widened at that place by a concession made by the Navy Department, then there is also included in that ground, by you considered and marked as the road zone, the strip of land granted by the Navy Department?' And the witness answers: 'Yes, the strip of land was granted, but the embankment is included. The other day I said, in answer to your questions, that the width of the zone by me marked out as the road zone at the place of the crossing in litigation was included in the embankment where defendant's double track is laid, and I answered that the traveled road, with its gutters, covers a space of 13 meters 78 centimeters, and that the portion occupied by the embankment and defendant's tracks amounted to 6 meters 92 centimeters, but it was not the traveled portion; it is the remainder of the road zone to which I referred in speaking of the 13 meters 8 centimeters, counted from the northern rail of the track to the northern side of the road zone.

\*        \*        \*        \*        \*        \*        \*

" 'In this road zone, at the place where the crossing is situated, in this same portion of land where the crossing has been marked out in the plan, some land of the road is included, but I cannot say exactly how much is included on the north of the gutters because I have not measured it.' "

From the testimony of Armando Morales, master major of military engineers, also in the corps of civil public works under the Spanish régime, architect and chief of the division

of public lands for some years after the American occupation
and a witness for respondent, we quote the following:

"Prior to the Royal Order of April, 1897, there were certain
laws of strict zones at San Juan, and especially over that third zone
lying between the first and second lines of fortification. The military
rules allowed eight meters for the road, and the corps of military
engineers, to which I belonged, was in charge of that; the zone laws
having been modified by the Royal Order of April 27, 1897, the com-
mittee appointed conceived the purpose of widening the road to 20
meters from San Juan to Santurce and to that end began its work,
which work never took legal effect because war then broke out, the
change of sovereignty ensued and the commission did not finish its
work; but there existed, of course, the idea of giving that road
a width of 20 meters from San Juan throughout Santurce, if possible,
wherever necessary, naturally, in accordance with this idea, and when
American control supervened a parcel was surveyed for the munic-
ipality by reason of a petition for a Royal Order during the Spanish
régime, and that parcel was granted and sold to the municipality,
giving to the *carretera* a longitude of one meter to the north of the
highway, in front of that building, marking the lines of the façades;
and as that idea was adopted in the second zone also, it follows that
the lines were run accordingly. That plan of the commission to
widen the *carretera* from San Juan to Santurce to 20 meters was
never carried out. While I was an officer of public works and of
the military engineers and after the change of sovereignty the width
of the road at that place was always deemed to be the same, eight
meters.

"As I understand, the road has always been eight meters wide
and no more; in the reports made by the board of public works it
has been stated that the lack of communication is due to the narrow
width; I know that by official reports. As chief of public lands of
the Department of the Interior I took part in the demarcation made
of the naval lands, and by virtue of said demarcation, based upon
said demarcation, the President of the United States made his Pro-
clamation reserving public lands for naval uses. Should I see the
plans I would recollect which one is parcel A of the lands reserved
for naval purposes where the garbage is dumped in Puerta de Tierra
*   *   *. I did not intervene directly in that tract of land, for a
reason; because when I began to survey said tract, just then the
agents of the Federal Government ordered the stakes to be pulled
up and Governor Post and I went in person to the land, when we

ran these lines. Precisely being in charge of the division, we never reached this parcel because the persons in charge thereof moved the stakes, because they said that they were not authorized to divide lands, and after I left the division I did not intervene directly; when that parcel was surveyed I was not then chief; that was afterwards. I was not chief when that tract of land was surveyed. I made the reports on the project of giving a width of 20 meters; I made some report in that sense of carrying on the project. I made a private report but it may be that I made an official one, I don't remember; I had no reason to remember, but if I made any report it would be in support of the opinion I had that this road should be given a width of 20 meters; the view of widening that stretch from San Juan to Martín Peña; that that road should be given a width of 20 meters; when I made that report it was because I believed that the highway was not 20 meters in width, because the road was but eight meters wide; officially it was but eight meters wide; I don't say that I made a false report, as a public officer, because it was done in accord with my superiors at that time. We were chiefs of divisions; we were mere officials."

Confronted on cross-examination with the certificate dated November 27, 1902, *supra,* the same witness says:

"This report shown me is a report made by me when I was superintendent of public lands in the Island of Porto Rico. The demarcation I made is in a tract of land existing in the zone of the ward of Puerta de Tierra of this capital. This is a tract of land belonging to the municipality of San Juan, the lot where the cigar factory, previously the jail, is situated, there I say. This parcel of land is situated in the third zone of the *barrio* of Puerta de Tierra in this city, adjacent to the southern margin of road No. 1 and within the space lying between the first and second lines of defense of this city. In that part to which counsel refer I rectify what I have already said. It says: 'This tract of land is situated in the third zone of the ward of Puerta de Tierra adjacent to the southern margin of road No. 1.' I mean that the zone of land is adjacent to road No. 1; I am referring to the parcel of land sold by the municipality of San Juan and where the civil hospital was originally installed, afterwards a jail and now the Colectiva factory. When that parcel of land was surveyed it was said: 'In the zone of land adjacent to the southern margin of road No. 1.' Again I ratify my statement; therefore it is not road No. 1;. it is a zone to the south

adjacent to road No. 1, to that I referred and continue to refer. That boundary does not touch the road; it doesn't say that. That survey is perfect because it refers to fixed points on the ground. The center of the road is today undetermined."

＊  ＊  ＊  ＊  ＊  ＊  ＊

"Road No. 1. Formerly, in order to fix the roads the work was begun by determining the center and afterwards the bed. The bed today in that road is rather undetermined, inasmuch as it has no gutters, but its bed terminates just as the streets are today. That road has no exact determined line, and the only fixed points in it are those used for the survey, which are fixed masonry monuments, to which the plat refers. That survey is quite accurate; it is a survey fixed by all generalities, and the road is rather undetermined because it has no gutters. The gutters are formed today by the macadamized edge of the embankment, as are the streets of San Juan. It is undetermined and the points long ago fixed there are unchanging masonry monuments and this survey refers to that; the roads on embankments have no zone beyond the foot of the embankment in the Island of Porto Rico. No official provision is to be found, nor does one exist."

On redirect:

"This report about the sale of buildings by the Insular Government was to the municipality of San Juan; it was regarding the sale of Insular property to the municipality of San Juan, so that the Insular Government could fix the limits, as owner of the soil, such boundaries as it might deem convenient. I said that one of the ideas in fixing these boundaries and transferring the property to the municipality of San Juan—fixing the northern limit of the property at a distance of one meter from the façade—was to leave a sufficient width for the road should the widening ever be carried out. In this contract between the municipality and the Government nobody intervened but The People of Porto Rico; that is, the Insular Government and the municipality of San Juan. One of the ideas was not to prejudice that of the street tramway as established by the aforesaid Royal Order, and for that reason lands on the north of said line were not granted."

Called upon to explain Exhibit 8 for petitioner, a plot upon which the signature of witness appears, and described upon its face as "Naval Reservations at San Juan City, as proposed by the Joint Commission composed of Capt. Sam

C. Lemly, United States Navy (retired), for the United States Navy, and Frank Feuille, Attorney General of Porto Rico, for The People of Porto Rico,'' he continues:

"The plan itself, as I have already said, does not state that the road is 20 meters wide. This was a project involving more an agreement made to carry the lands occupied by the Federal Government and the Insular Government; to designate certain parcels belonging to the Federal Government, and undoubtedly the object was to determine the land and deliver it to the Federal Government and to the Insular Government. And it does not mean that the road is 20 meters wide, because there are the tracks, and the tracks are not in the road. In the second place, the English description says 'the south side of the road'; if it had been bounded by the road the natural thing to say is: 'It adjoins the road on the south side.' That is what it says, so I understand it. That was said in Spanish, that the land was on the south side of the road. Therefore both the certificate and plan clearly say that 'it is not bounded by the road' (*con la carretera*).''

"An Act to fix the right of way of Insular and Municipal Roads,'' approved March 14, 1907, provides (italics ours):

"Section 1.—The right of way of all Insular roads *to be constructed hereafter* shall be not less than nine meters sixty centimeters (9.60) in width at grade, with such additional width as may be necessary for the slopes of cuts and embankments; this additional width to be increased by a strip of land on each side of the road measuring one (1) meter in width from the outer edge of the slope.

"Section 3.—The Commissioner of the Interior shall fix the right of way of Insular roads *already constructed, taking as a basis the minimum widths prescribed herein; Provided, however,* That in cases of doubt, or of nonconformity of abutting property owners, the testimony of witnesses shall be obtained as to the limits which have always been known to them, considering also the plans of the respective projects, should they exist, and any landmarks on any other section of the same road showing beyond doubt its width, and by a survey of the abutting properties.''

Sections 1 and 4 of "An Act to authorize the Commissioner of the Interior to survey and construct a section of road which, starting at San Antonio bridge, shall terminate

at Martín Peña bridge, parallel to the military road and on the south side thereof," approved March 11, 1909, only a few weeks before the granting of the franchise upon the provisions of which this suit is based, read as follows:

· "Section 1.—The Commissioner of the Interior is hereby directed to cause to be surveyed and constructed a section of road, which shall start at the San Antonio bridge on the military road, and shall terminate at the Martín Peña bridge, on the military road, within the Municipality of San Juan, and running parallel to said main road and on its south side, condemning therefor a strip of land not less than twenty (20) meters wide and at a distance of approximately one hundred and fifty (150) meters from the aforesaid military road.

"Section 4.—Said road upon completion shall be maintained by the Commissioner of the Interior, and for that purpose said official shall have all the powers now possessed by him in respect to the maintenance of the main road, but the Municipality of San Juan shall in other respects have such jurisdiction over said new road as it now has over the existing main road."

Section 1 of that franchise contains, among other more or less significant paragraphs, the following:

"Fifth: For a double track, from said point opposite the said wireless telegraph station, in an easterly and southeasterly direction over the right of way of grantee and of said San Juan and Río Piedras Railroad Company, which is hereby widened to ten (10) meters to accommodate said double track, to the point where said right of way intersects the street immediately east of the Union Club and to what is now Stop 10 of said railroad; together with the switches, sidings and turnouts already constructed along said route; *Provided,* That a single track only may be used to cross the bridge over the 'Caño de San Antonio.'

"Eighth: For a single track from where grantee's double track shall end at said Stop 10 south along the street beginning at Stop 10 to its intersection with the new street to be constructed not over one hundred and fifty meters south of the *Carretera Central,* and thence in an easterly, southeasterly and southern direction, as the case may be, along said new street or highway to be hereafter constructed by the Island of Porto Rico and the Municipality of San Juan, one or both, in a line running generally in a parallel direction to said *Carretera Central* to the 'Caño Martín Peña' bridge, together with

such switches, sidings and turnouts on said route as may be here-
after shown on the plans of this route to be filed with and approved
by the Executive Council of Porto Rico.

"Ninth: For a single track from the intersection of an extension
of Egozcue Street, sometimes known as Park Street, in said Santurce
ward, with the new road to be opened parallel to said main road,
thence in a generally north or northeasterly direction, along said
Egozcue Street across said military road; and thence along the
present private right of way of grantee to Borinquen Park, together
with the switches, sidings and turnouts already constructed along
said route. Grantee is hereby granted the option of double-tracking
the whole or any portion of said road, or spur, from the intersection
of said Egozcue Street with the Military Road to Borinquen Park,
and of constructing therein such terminal facilities as may be neces-
sary for handling its cars.

"Tenth: For a single track from the present power-house of the
grantee along its present private right of way in a generally south-
westerly direction to the *Carretera Central,* thence across said *Carre-
tera Central* to its present track parallel to said *Carretera Central,*
and thence in a generally southerly direction either along Cerra Street
or one of the two streets immediately east thereof, as the Executive
Council may determine, to the track described in paragraph eight .
hereof."

## And sections 5 to 8, inclusive, are as follows:

"Section 5.—Grantee shall within three months from the date of
its acceptance of this franchise, begin the construction of that part
of the additional lines of railway authorized by the second, third,
fifth and seventh paragraphs of section 1, and shall complete and
have in operation said parts of the additional lines authorized by
the said paragraphs within fifteen months from the date of its
acceptance of this ordinance.

"And said grantee shall begin the construction of that portion
of the additional lines of railway authorized in the eighth, ninth and
tenth paragraphs of section 1 of this ordinance lying between Stop
10 and the Martín Peña bridge within three months from the time
it may be notified by the Commissioner of the Interior that the new
highway along which the said additional line of railway is authorized
to be built is opened up and in a condition to permit of said grantee
entering upon the same and undertaking the work of construction
of the said additional lines and shall finish the same within fifteen

months from the date of said notification by the Commissioner of the Interior. As far as practicable, the work of constructing said additional line along said new highway shall be prosecuted at the same time that the work of opening up the highway for the accommodation of pedestrians and ordinary vehicles is being performed. Said grantee hereby undertakes to pay twenty thousand dollars ($20,000) toward the cost of the said new highway. The payment of said sum by the grantee shall be made to such authorities, and in such manner and form, and at such times, as the Executive Council shall hereafter determine.

"Section 6.—The right of way to be allotted to grantee on said new highway to be opened up for traffic shall be four meters in width and wherever practicable, shall run along the side of said new highway between the gutter and the sidewalk.

"Section 7.—An accurate survey of the additional routes of said railway authorized hereby shall be submitted by the grantee, through the Commissioner of the Interior, for the approval of the Executive Council, as hereinafter provided, and all plans for road-beds, tracks, side-tracks, culverts, bridges and embankments, for the same, and for the general construction of said additional railway, shall be submitted to the Commissioner of the Interior and be approved by him before the work of building the same shall proceed.

"Section 8.—The right of way for said lines of railway and such overhead trolley and feeder construction as may be incident thereto, together with branch power transmission pole lines from the power stations to the main and branch lines, is hereby granted through and over all Insular public lands, and through the land, streets, and highways of the said municipalities under the supervision of the Commissioner of the Interior or such other authorities as may have control of the same; *Provided,* That in so far as concerns the lines of railway already constructed and in operation, the right of way of the same and of the overhead trolley and feeder construction incident thereto and of the branch power transmission pole lines from the power stations to the main and branch lines, shall remain as at present located."

If by reason of the surveys and so-called "reservation" upon which the Government rests its case and without further action or indication of any more definite intention to dedicate the strip so reserved to road purposes, sections 10 and 11 were intended to apply immediately to the portion of double track

and right of way described in paragraph 5 of section 1, it
is passing strange that in ratifying and widening the old
right of way of appellant to accommodate the new double
track authorized in that paragraph, in fixing time limits for
the work to be done (1st paragraph, section 5), and in striking
contrast to paragraphs 8 and 9 of section 1, paragraph 2
of section 5 and the express provisions of the other sections
quoted, there is not the remotest suggestion of any thought
whatever of widening the Insular highway or including the
tracks and right of way of appellant within the now alleged
"zone reserved therefor."

"Since the decision in the Dartmouth College case, it has been
an established doctrine that a grant of rights in public property
accepted by the beneficiary will amount to a contract entitled to pro-
tection against impairment by action of the State, or municipalities
acting under State authority.   Concurrent with this principle, and
to be considered when construing an alleged grant of this character,
is an equally well established rule, which required such grants to
be made in plain terms in order to convey private rights in respect
to public property, and to prevent future control of such privileges
in the public interest.   But while it is true that such grants will
not be sustained by doubtful words, and that ambiguity vitiates them,
yet this rule is qualified by another: that such grant and the statute
making it must receive a reasonable construction and not be so con-
strued as to defeat the intention of the legislature; and that the
ambiguity must be such as is not removed by the settled rules of
construction.   It is also a well-known rule of construction that so
long as the language of the statute or ordinance is plain or unam-
biguous it is not subject to interpretation, nor open to construction,
but must be accepted and enforced as it is written.   Generally speak-
ing, the practical interpretation of a contract by the parties to it
for any considerable period of time before it comes to be the subject
of controversy is deemed of great, if not controlling, influence."
12 R. C. L. 21, sec. 195.

Construing the words "within the space reserved there-
for" in the light of these principles, of the context and of all
the facts and circumstances above outlined, we are con-
strained to hold that the language quoted does not refer to

a zone such as the one involved herein—defined at the site of the crossing only by lines arbitrarily run in accordance with a theory upon the part of the Commissioner of the Interior and his subordinates, or of commissioners named for purposes entirely foreign to the matter of laying out, dedicating, opening up or fixing the boundaries of any public highway, as to the desirability of eventually widening the *carretera,* the surveys so made being unauthorized by any law dealing directly with the public highway referred to or with public roads in general—and indicated at another point by the segregation and sale of a parcel of land and the marking of the boundaries thereof pursuant to the same or a similar praiseworthy and farsighted, but necessarily tentative, plan for the more or less distant future.

If section 11 contemplates anything at all beyond the regulation of track resting upon the road itself or a zone actually in use as part thereof, and if the third paragraph of section 11 can be regarded as contemplating anything more than a remedy for the enforcement of the obligation placed upon the grantee in the preceding paragraph, yet the alterations or repairs required should, we think, bear some relation, if not to the freedom of traffic, at least to "the proper drainage and maintenance of said road or thoroughfare."

To say that, without reference or regard to the interests or convenience of appellant or to the safety and comfort of the public transported by it, the Commissioner of the Interior, by virtue of the power conferred upon him in the franchise, may oblige appellant to construct and maintain at such point or points as he may designate a crossing or any number of crossings in nowise connected with the traffic, drainage, or maintenance of the Insular highway, is perhaps not so plausible as to assert that he may compel appellant to "alter" the grade of its road to conform to that of the *carretera* and to pave or macadamize the space between the rails of each of its double tracks and for a distance of one

and one-half feet on either side thereof throughout the zone reserved by him for road purposes, notwithstanding the fact that no other portion of such zone is at present utilized, or susceptible of being utilized, for travel or at any time in the near future to be opened to traffic. Thus, by simply connecting the two ends of the newly made roadbed with the *carretera* proper he might provide at the cost of a small culvert or two practically a double highway from the line of second defence to San Antonio bridge, and the plan, however fantastic and otherwise open to criticism, would have the merit of bearing some degree of relationship to the purpose of the so-called reservation.

But we do not believe that either such a possibility or crossings of the character sought to be established herein were ever in the mind of either of the parties to the franchise of 1909, or by any fair and reasonable interpretation of that document can be held to be included among the ''alterations or repairs'' to which reference is made.

However, in the brief filed by counsel for appellee the argument is based not so much on the express provisions of the franchise solely and exclusively relied upon below as upon the right of ingress and egress that any private property owner similarly situated might exercise and, if resisted, enforce. Without considering the merits of this contention it will suffice to say that the judgment appealed from, in so far as it can be regarded as based upon the ground indicated, is void, and the question so raised cannot prosper in this appeal.

''A judgment is the law's last word in a judicial controversy. It may therefore be defined as the final consideration and determination of a court of competent jurisdiction upon the matters submitted to it, in an action or proceeding. A more precise definition is that a judgment is the conclusion of the law upon the matters contained in the record, or the application of the law to the pleadings and to the facts, as found by the court or admitted by the parties, or deemed

to exist upon their default in a course of judicial proceedings. It should be noted that that only is a judgment which is pronounced between the parties to an action upon the matters submitted to the court for decision." 15 R. C. L. 569, secs. 1, 2.

If the defendant appear and answer the court may grant plaintiff "any relief consistent with the case made by the complaint and embraced within the issue." Code of Civil Procedure, sec. 191.

"In order to give a judgment the merit and finality of an adjudication between the parties, it must be responsive not only to the proofs but to the issues tendered by the pleadings, because pleadings are the very foundation of judgments and decrees. A judgment will be void which is a departure from the pleadings, and based upon a case not averred therein, since if allowed to stand it would be altogether arbitrary and unjust and conclude a point upon which the parties had not been heard." 15 R. C. L. 604, sec. 43.

"It is well settled that the theory upon which the case was tried in the court below must be strictly adhered to on appeal." 2 R. C. L. 79, sec. 55. Id. 183, sec. 156.

"One of the most important results of the rule that questions which are not raised in the court below cannot be raised in the appellate court is that a party cannot, when a cause is brought up for appellate review, assume an attitude inconsistent with that taken by him at the trial, and that the parties are restricted to the theory on which the cause was prosecuted or defended in the court below. Thus, where both parties act upon a particular theory of the cause of action, they will not be permitted to depart therefrom when the case is brought up for appellate review. And the same is true where the parties act upon a particular theory of defense or of opposition thereto." 3 C. J. 718, sec. 618. Id. 669 *et seq.* and 727 *et seq.*

See also *Figueroa* v. *Figueroa,* 23 P. R. R. 418; *People* v. *Fajardo,* 23 P. R. R. 841, and *Belaval* v. *Todd,* 24 P. R. R. 765.

The answer of respondent denied that the crossing was necessary as a means of access to the lands of petitioner lying to the south of the railway, and at the trial, upon an attempt being made to defend against the possibility of such

a claim under certain allegations contained in the petition, the following incident occurred:

" 'Please tell the court whether the crossing at that place tends to obstruct or interfere with the traffic over the tracks of the defendant company there, and whether it is a source of danger.' 'The petitioner objects; that is not pertinent to the issue in this case; that is no defense. The only question at issue is whether the track at that place is on public lands within the zone of the highway. If it is within the zone of the highway, the defendant, under its franchise, is required to maintain the crossing established there, and the question is not affected by whether the crossing creates any obstacle or not. The respondent contends that if this were the only question raised by the complaint and if it had been plainly stated, there would be no need to offer this evidence; but as your honor, the court, will observe, the complaint is drawn in such form that it is difficult to tell what is the true basis of this action. First, it is claimed that the petitioner is entitled to establish a crossing at that place because it forms a part of the highway, of the zone reserved for the highway, and because of the provisions of the franchise; and further on in the complaint, in complete disregard of this contention, other facts are alleged which from the said point of view would not be pertinent; that is to say, it is alleged that this is the only means of access to the parcel of land belonging to The People of Porto Rico, and I presume that the purpose of this allegation is to establish a right of way to the land which is separated from the highway by another tract. And the petitioner has also offered evidence on this point to show that this is the only feasible means of ingress to the parcel of land belonging to the petitioner. Pursuing this idea, without admitting that it is pertinent as evidence, that it is evidence which can be considered in this case, we are entitled to show that this right of way has not been established at a place which is convenient to the defendant company; for, as the court is well aware, according to the provisions of the Civil Code, the place at which a servitude of right of way should be established over an estate by the owner of the dominant tenement must be a place convenient to the owner of the servient tenement. I do not know whether any importance attaches to this point, but as the petitioner has raised the question, I think we are entitled to show that the place is not a convenient one and constitutes a menace to defendant's operations. Besides, your honor, we have alleged in the answer that the crossing at the place where it has been established constitutes a menace to the operation

of the respondent's line and is in violation of the franchise granted the respondent company.'

"The judge: 'In what clause of the complaint is that alleged?' Respondent: 'In the answer.'

"The judge: 'In what part of the answer?' Respondent: 'In the seventh paragraph. The respondent alleges that the said forcible entry by the petitioner on the track of the respondent took place without any legal authorization therefor, and that the establishment and maintenance of the grade crossing at the spot in question interferes with the service of the respondent company and constitutes a menace to the operation of its electric cars. From the viewpoint of the relative convenience or inconvenience, this being a point which the court will also have to take into consideration, the evidence we offer is also pertinent.'

"Petitioner: 'May it please the court, this action does not involve a servitude of right of way of necessity; our complaint is based on one or two clauses of the franchise of the respondent company, which provide that when the track crosses public land the respondent company shall maintain at its expense the crossings required by The People of Porto Rico; and in order to show that we are entitled to that right of way, we must prove that the track lies on public land, on land reserved for the highway zone. To secure an injunction we must allege serious injury, irreparable damage, and that is the object, the only object of the allegation to which the opposite party refers. I think that it is very plain. It is alleged at the end of the complaint that petitioner, through its Sanitary Department, will suffer great injury and irreparable loss if the said right of way is not allowed to remain in the place and form it formerly was. Of what does this injury consist? It goes on to say that any other means of access or ingress and egress to said refuse-dump is impracticable and difficult and would cause great difficulty and expense to said Department of Sanitation. That does not change the proceeding for injunction into one to establish a servitude of right of way of necessity. And as to the answer, the first part of the clause read by the adverse party is immaterial, therefore he is not entitled to offer evidence in support thereof. As regards the franchise, of course if we cannot prove that the crossing is located on public land, it follows that we have violated the franchise and are not entitled to the said grade crossing.'

"The judge: 'But how can the court prevent the respondent from proving one of the allegations of its answer, which has been

set forth by the petitioner? I am of the opinion that under the theory that this is a fact alleged in the answer the question can only be admitted to show what is alleged by the respondent company in its answer to the complaint, namely, that the grade crossing at the place referred to interferes with the work of the company and hinders and obstructs the operation of its electric cars.'

"Respondent: 'But the point to be proved is whether that crossing would cause great and irreparable loss to the respondent company. The court admits the question under that theory, namely, that it constitutes a menace to the operation of the electric cars. Petitioner excepts to the ruling of the court in admitting the said question regarding the nature of the damages suffered by the traffic of the electric cars. I except to all questions along that line.' "

So during the examination of the next witness:

"Respondent: 'Why was it that the company removed the boards and did away with the crossing at that place?' Witness: 'Because, in the first place, a public crossing at that place would be dangerous.'

"Petitioner objects, as regards the danger, on the same grounds as before. The judge asks whether the question inquired into the reason for removing the crossing; the respondent answers that it was as to why the company removed the crossing. Then attorney for the petitioner says that he does not object if it is stated only that it was dangerous, but that he would have to object if it were stated of what the danger consisted. Respondent contends that the witness has not completed his answer and that it is the same question raised this morning; the same objection. Petitioner asks if it is sought to be shown by the witness that it is a dangerous crossing, and the respondent answers that that was not the object of the question but that he was going to ask about that point.

"The witness continued to testify: 'We knew at the time the crossing was put in that it was to meet the requirements of the Insular fair board as an emergency crossing, and as the said board was making great efforts to prepare the Insular fair grounds so that the fair might be inaugurated on Washington's Birthday, and under these circumstances it would be only for a few days and as we were doing everything possible to aid the managers of the Insular fair, we did nothing. Permission to establish a permanent crossing would have been refused if asked, because it is a very dangerous spot.'

"Respondent: 'But the question is why was the crossing removed. Petitioner moves to strike the answer because it is not responsive to the question. Respondent says that all that, in his opinion, is a preliminary explanation of why the said crossing was removed; the judge orders the stenographer to read the question and the answer, and he did so. Respondent states that the witness is explaining why the crossing was left in that place for so long a time before removing it, why it was not removed immediately, and I suppose he will now proceed to explain why it was removed; that petitioner asked the other witness, Mr. Sewell, this morning why it was that this crossing was allowed to remain so long before removal. The witness now says that he has not completed the answer and the judge tells him he may continue.

" 'Petitioner says that it is admitted that it was removed because it was regarded as dangerous, but if he is going to explain of what the danger consisted, we must object.' Thereupon counsel for respondent states that the witness now says that he is going to continue explaining why it is dangerous. Petitioner suggests another question for the purpose of objection and exception. The court orders that a new question be put.

"Witness: 'I learned that the crossing was not of a temporary character some days later when I observed that the sanitary wagons were making use of the crossing.'

"Respondent: 'Please tell us now why the crossing was dangerous.'

"Petitioner: 'We now object on the same grounds; it is sought to introduce evidence tending to prove that it was a dangerous spot and that point is not in issue.'

"The judge rules to admit the question on the same theory stated this morning, because it is an allegation of the answer.

"Petitioner: 'I except.'

"Respondent says that he has not questioned the witness regarding his experience with electric cars and tramways, but presumes the objection is not based on that ground; the judge says that it is based on the contention that it is no defense."

\*        \*        \*        \*        \*        \*        \*

Again:

"Counsel for respondent asks the witness what effect the right of way or crossing at that place had upon the operation of the electric

cars.  Petitioner makes the same objection on the ground that it is immaterial and takes the same exception."

Although respondent in this manner, over the constant and insistent objection of petitioner, managed to get in some evidence with respect to the dangerous character of the crossing as offsetting the great inconvenience and irreparable damage alleged in the petition, the trial, at least up to the time of the "ocular inspection" if not up to the moment of rendering judgment, did not proceed at all or at any stage thereof upon the theory of the establishment of a predial servitude based upon the fact of ownership and the right of ingress and egress.  Indeed, that petitioner, in the court below, earnestly disclaimed and most emphatically repudiated any such theory is more than self-evident.

It follows that the respondent company has never had its day in court as to this feature of the case and the claim of petitioner made for the first time in this court and based upon the principle inspiring sections 571 *et seq.* of the Civil Code, cited by way of analogy in the brief of appellee, comes too late.  These sections read in part as follows:

"Section 571.—The owner of a tenement or property surrounded by others belonging to several owners, and having no exit to the public highways, has the right to demand the right of way through the neighboring tenements on paying the proper indemnity.

"Section 572.—The servitude of the right of way shall be at the point least prejudicial to the servient tenement, and, in so far as is consistent with this rule, where the distance from the dominant tenement to the public road may be the shortest."

And as we have just shown, the effort of appellant to anticipate and defend against any such theory of the case was strenuously and successfully resisted by petitioner in the court below.

In the view we have taken of the case it becomes unnecessary to consider the contention of appellant that—

"1. The facts alleged in the complaint, or petition, do not estab-

lish a cause for issuing a writ of injunction, and the court erred in issuing the writ based on such facts.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

"3. The court erred in not holding that the petitioner is estopped from asserting as against this respondent that the said crossing-place is within the zone reserved for the highway.

"4. The court erred in admitting in evidence exhibits 1, 2, 6 and 7 of the petitioner.

"5. The court erred in allowing questions to be put to witness Larrínaga, over the objection of the respondent, regarding the meaning of a memorandum.

"6. The court erred in allowing the questions of the petitioner regarding reputation."

The judgment appealed from must be

*Reversed.*

Chief Justice Hernández and Justices Wolf and Aldrey concurred.

Mr. Justice del Toro dissented.

---

### DISSENTING OPINION OF MR. JUSTICE DEL TORO.

After a comprehensive discussion of all the questions involved in this appeal it has been concluded by a majority of the justices of this court that the judgment appealed from should be reversed. I am unable to agree with them. Looking into the essence of the matter, in my opinion the attitude of the defendant company appears to be so notoriously unjust that it should not have the support of the court. What has occurred in this case should be fixed permanently in the minds of the officials who are intrusted with the disposal of the public wealth by means of franchises so that they will grant them with the proper reservations and restrictions.

For the sake of greater clearness I should begin my opinion by transcribing the petition for an injunction. But inasmuch as the said petition is copied into the opinion of the court, I will omit it in order to avoid repetition.

The appellant corporation assigned the following errors as committed by the district court:

### I

"The facts alleged in the complaint or petition do not establish a cause for issuing a writ of injunction and the court erred in issuing the writ based on such facts.

### II

"The court erred in holding that the evidence shows that the place where the crossing was established was a space reserved for a *road* or public thoroughfare.

### III

"The court erred in not holding that the plaintiff is estopped from asserting as against this defendant that the said crossing-place is within a zone reserved for the highway.

### IV

"The court erred in admitting in evidence Exhibits 1, 2, 6 and 7 of the petitioner.

### V

"The court erred in allowing questions to be put to witness Larrínaga, over the objection of the respondent, regarding the meaning of a report (exception p. 48 of the transcript).

### VI

"The court erred in allowing the questions of the plaintiff regarding reputation (exceptions pp. 49, 50, 53, 54 and 56 of the transcript)."

1. I will consider the first assignment. In discussing it the appellant subdivides it into four parts, designated by the letters *a, b, c* and *d.*

*a.* The appellant contends that "in the supposition that it was the duty of the defendant to construct the crossing, according to the terms of the franchise of 1909, at the order of the Commissioner of the Interior, or to allow such crossing to be established, a mandamus, and not an injunction, is the proper and appropriate remedy."

To this the appellee correctly replied:

"The wording of the two sections or clauses from which it is sought to deduce the impropriety of the remedy prayed for is perfectly clear and it may be seen from them that the obligation imposed upon the defendant is not an absolute obligation or duty, but is subject to the following alternative: If the company should fail to act, then the Government itself may construct the crossing which the defendant refused to construct and collect the cost from the latter. So that, assuming a refusal on the part of the defendant, the same result that would be obtained by a mandamus may be obtained by the Government by virtue of the franchise itself, which unquestionably would make the remedy by mandamus improper, not only because an absolute obligation or duty is not established, but also because it would be a remedy obviously unnecessary, ineffective and unauthorized."

*b.* "No irreparable injury is shown from the facts alleged in the complaint" and therefore, contends the appellant, "the writ of injunction should not be granted."

The law in force in Porto Rico authorizing writs of injunction (Comp. of 1911, p. 272) is quite comprehensive. Section 3 specifies seven cases in which this "strong arm of equity" may be employed. One of them is "when it appears by the complaint or affidavit that the commission or continuance of some act during the litigation would produce waste, or great or irreparable injury, to a party to the action."

The petition shows the manner in which the plaintiff and appellee alleged the irreparable injury at the end thereof. The word "irreparable" has acquired a meaning in the law of injunctions which perhaps is not in harmony with the derivation of the word or the literal meaning thereof, according to 14 R. C. L. 346. Besides, the statute does not refer exclusively to irreparable injury but also to great injury, and it cannot be denied that if the claim of The People of Porto Rico is just in this case, it would suffer, if not an irreparable injury, at least a great injury in being compelled to

use another road, the conditions of which I shall have occasion to refer to later, for the passage of its garbage wagons.

c. "The terms of the franchise," alleges the appellant, "on which the plaintiff's petition is based, do not oblige the defendant to construct and maintain a crossing over the track at the place referred to in the complaint by order of the Commissioner of the Interior, or to allow such crossing to be constructed and maintained."

In my opinion, the appellant is partly right on this point. A careful perusal of the clauses of the franchise transcribed in the petition easily justifies the conclusion that the obligation of the defendant company to maintain the road-bed between the tracks and for a space of one and one-half feet on either side thereof wherever the said rails cross or rest upon the road or other public thoroughfare, in a condition satisfactory to the Commissioner of the Interior, does not carry with it the obligation to construct the crossing under consideration in the present case.

If the right conferred upon the Commissioner of the Interior by the said clauses were the only right pertaining to The People in this case, the judgment appealed from should be reversed and the petition for the writ of injunction denied *in toto*.

d. "The writ of injunction," finally contends the appellant in support of the first assignment of error, "did not lie because the complaint did not show that the plaintiff had a clear, lawful or equitable right."

I shall state my opinion as to this in considering the second assignment of error.

2. Are the defendant's tracks within the highway, or the space reserved therefor, at the place where the crossing in question is, or are they not?

The district court held that they were within the zone reserved for the highway. The appellant maintains that they are not within the highway, because it was never wide enough to include them; that neither are they within the so-called

zone reserved for the highway, for such zone never existed, and that if the limits thereof were ever fixed it was done without the knowledge of the appellant and therefore can not affect it.

It clearly appears from the record that on February 18, 1878, the Spanish Government granted the necessary franchise to Pablo Ubarri to lay a railroad track between the capital of Porto Rico and the town of Río Piedras. The track was actually built and a section of it was within the highway maintained by the State and which then connected and now connects the capital, which is built on a small island, with the main island of Porto Rico. At the place where the crossing which forms the subject-matter of this action exists the track was within the highway.

Some time passed and Ubarri asked for and obtained from the Spanish Government leave to make certain changes in the plan of the railroad. One of these changes was to remove the tracks from the highway and place them outside of and parallel to it for almost its entire length. At the place involved in this action the tracks were taken up and laid upon an embankment constructed expressly by Ubarri on the right, going towards Santurce, of the row of trees which marked the highway.

Therefore the appellant is right in maintaining that the tracks of its predecessor Ubarri, after the changes made in the plan referred to, lay outside the highway, which, according to the law then in force, was eight meters wide. II Escriche, 162, and the law cited.

Years passed, the change of sovereignty took place and the railroad belonging to Ubarri was sold, the purchaser naturally acquiring all the rights of Ubarri.

On May 6, 1909, the Executive Council of Porto Rico granted to the San Juan Light & Transit Company, the successor of Ubarri, the right to own, construct and operate an electric railway between San Juan and Río Piedras. The franchise was approved by the Governor on May 11, 1909,

and by the President on the 21st of the same month and year. It contains thirty-three sections, in which reference is made to the original concession and its modifications, to the regulations of the Military Government of the new sovereignty and of the Municipal Government, and to other particulars, and it may be said that with that a new life began for the railroad whereby from that date electric cars have run and continue to run instead of cars drawn by steam locomotives. Sections 10 and 11 of the franchise were translated into Spanish and copied into the complaint, and it is to be noted that in the last paragraph of section 11 the words "or within the space reserved therefor," which should have been inserted between the words "public" and "shall have" of the said paragraph, were omitted. By the new franchise the grantee was authorized to lay a double track at the place referred to in this action, among others.

The defendant company, the Porto Rico Railway, Light and Power Company, acquired the said franchise and others, and on March 17, 1911, the Executive Council approved the transfer and gave new force and vigor to the former concessions under certain conditions, which were plainly expressed, and its action was approved by the Governor of Porto Rico and by the President of the United States on March 21 and March 30, 1911, respectively.

Before granting the franchise of 1909 persons duly authorized by both Governments surveyed the lands of the island of San Juan for the purpose of determining what part belonged to The People of the United States and what part to The People of Porto Rico. Plans were made and the width of the highway at the place in question was fixed at twenty meters.

According to the testimony of F. W. Teale, a witness for the defendant, the double track authorized by the franchise of 1909 was laid in 1910. To do this it was necessary to widen the embankment, lessening the distance between it and the highway, and the row of trees which lined the right side of

the highway, going in the direction of Santurce, was cut down. The double track did not encroach upon the macadamized part of the highway, or the old zone of eight meters, but it was within the space of twenty meters fixed by the survey referred to.

At the trial the plaintiff introduced evidence to show that from the time of the former sovereignty the road at the place in question was always considered to be twenty meters wide. The trial court admitted and gave credence to that evidence, but I shall disregard it entirely and base all of my conclusions upon the fact that the width of the highway during the former sovereignty was eight meters; that these eight meters, after the change in the plan of the original track by Ubarri, were never encroached upon by Ubarri or by his successors at any time, and that the only document officially fixing the width of the highway at twenty meters was the survey mentioned.

To get a clear view of this action it is necessary to know exactly who are the owners of the land on which the track is laid and of the adjacent land. This land first belonged to the Spanish Government, then, by the Treaty of Paris, to the American Government, and, finally and now, to the Island of Porto Rico by grant from the American Government. These are facts admitted by both parties.

On the left of the defendant's double track, going in the direction of Santurce, are the highway, now completed, and the grounds of the Insular Fair belonging to The People of Porto Rico and bounded on the north by the Atlantic Ocean. On the right is another strip of land belonging to The People of Porto Rico, then the track of the American Railroad Company of Porto Rico, and then the refuse dump of the Sanitation Department of the Insular Government, which is bounded on the south by the waters of the Port of San Juan, Porto Rico. The land on which the tracks of the defendant are laid also belong at present, as already stated, to The People of Porto Rico.

Did the Spanish Government in granting to Ubarri the right to lay a track on this section of its property and the Executive Council in ratifying such grant renounce their rights to the strip of land occupied by the grantee's tracks to such an extent as to make it necessary to obtain the consent of the grantee before they could establish connections between the lands situated on either side of the track?

In my opinion the answer should be decidedly in the negative. All of that part of the island of San Juan up to the San Antonio bridge was known as the third line of defense of the fortified city of San Juan, and it cannot be supposed for a moment that it was the intention of the Spanish Government to obstruct in any way its means of communication.

A right of way was granted and that right, fixed in accordance with local conditions, is the only right which must be respected. The defendant company goes too far. I agree with it that its franchise should be respected and that its right of way should not be obstructed, but I can not agree with its contention that it is the arbiter to grant or refuse a crossing over its tracks to The People of Porto Rico, the owner of the land over which the said tracks are laid and of all the adjacent land at the place in question, bounded, as we have seen, by the ocean on the north and by the bay on the south and which forms, as a whole, a relatively narrow strip of the small island on which the capital of Porto Rico is situated.

Reduced to its proper terms, the case is simple. It is only necessary to determine whether the actual rights of the defendant have been impaired; that is, whether the authority which the defendant unquestionably possesses to operate its electric railroad has been interfered with in any way by the acts of The People. In this regard the ocular inspection made by the court, the photographic views introduced by the defendant itself and the plans produced by both parties, are important.

A careful study of all of these shows that the trial court

was justified in concluding that the crossing at the place where it is in no way interfered with the free and safe passage of the defendant's cars, and as this essentially constitutes the right which it possesses, it cannot be held that the grant made to it has been violated.

As may be seen, according to the opinion which I have formed of the case the fact of whether or not the defendant's tracks are within the space reserved for the highway is not decisive. But inasmuch as this question was so fully discussed at the trial, I will say that as the Governments represented by the Federal and Insular officials are the exclusive owners of all the land in question, they had the right to determine the future width of the highway connecting the capital with the Island without obtaining the consent of the defendant. Manifestly, in putting these plans into practice it will be necessary to take into consideration the rights acquired by the defendant. When the time comes, if the defendant's franchise should still be in force, then The People must reach an understanding with it regarding the changes it may be necessary to make. To destroy the embankment raised by the defendant, or to change the plan of its tracks in such a manner that its cars could not run properly, would be to violate the right of way granted to it; but to cross its tracks as often as necessary, especially as in this case, for the purpose of performing a public service, without interfering with the proper operation of its cars, is something different.

3. In considering the second assignment of error I believe that I have stated with sufficient clearness and detail my estimation of the case, which in some respects is different from that of the trial court. However, we have arrived at the same conclusion by different routes.

The opinion which I have formed renders it unnecessary to consider the errors assigned by the appellant under Nos. 3, 4, 5 and 6, for all of the evidence objected to by the said

appellant may be disregarded and yet the judgment appealed from may be sustained.

In conclusion, I will say only that an examination of any one of the various plans presented in evidence which includes the third line of defense of the city of San Juan, Porto Rico, will show that in crossing with its garbage wagons the tracks of the defendant at the place in question the Government reaches the dumping-ground in an almost direct route, whereas if compelled to use the old unmacadamized road it would have to make a long turn along partly sandy and partly marshy ground, to the detriment of its entire service.

In view of the foregoing, I am of the opinion that although the defendant company is not itself bound to construct the crossing in question or to reimburse the Government for the cost of its construction, it is bound to respect it and can not oppose the passage thereover of the Government's garbage wagons, always provided that such passage does not interfere in a practical and effective manner with its right of way which has been acknowledged and ratified on divers occasions.